# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 24, 2012 Session

## STATE OF TENNESSEE v. BERT DURAND HATMAKER

**Direct Appeal from the Criminal Court for Campbell County**
**No. CR13907     E. Shayne Sexton, Judge**

---

**No. E2011-01553-CCA-R3-CD - Filed July 30, 2012**

---

A Campbell County jury convicted the Defendant, Bert Durand Hatmaker, of one count of reckless endangerment, one count of assault, and one count of leaving the scene of an accident. The trial court sentenced the Defendant to concurrent sentences of two years for the reckless endangerment conviction, eleven months and twenty-nine days for the assault conviction, and thirty days for the leaving the scene of an accident conviction, with sixty days to be served in jail and the remainder to be served on probation. On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction for reckless endangerment. After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J. and D. KELLY THOMAS, JR., J., joined.

Michael G. Hatmaker (at trial and on appeal) and D. Brent Gray (at trial), Jacksboro, Tennessee, for the appellant, Bert Durand Hatmaker.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William Paul Phillips, District Attorney General; Michael O. Ripley and Leif Jeffers, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from an accident involving the Defendant's truck that occurred on August 15, 2008, resulting in a Campbell County grand jury indicting the Defendant for two

counts of assault with a deadly weapon, two counts of reckless endangerment, one count of assault by bodily injury, and one count of leaving the scene of an accident. At the Defendant's trial on these charges, the parties presented the following evidence: Ricky Allen Bailey testified that he did not know the Defendant, having met him only one time at the welding shop where Bailey was employed. Bailey said that, on August 15, 2008, he was driving his Ford F-150 in the right lane of a four-lane road with his seventeen-year-old son, Cody, when the Defendant, driving a Ford F-250, drifted into his lane. Bailey described this as "no big deal at all," explaining that he and the Defendant were traveling in the same direction and the Defendant was talking on a cell phone when he came into Bailey's lane. Bailey said, in response, he had to slow down and move over into the left lane but that he did not have to swerve to avoid the Defendant.

Bailey testified that he continued on the same road with the Defendant, even after moving into the left lane. He passed the Defendant, who was in the right lane, and noticed the Defendant was still speaking on his cell phone. Bailey "hollered" to the Defendant that the Defendant needed to "hang up and drive." Bailey denied shaking his fist at the Defendant or brandishing a weapon. The Defendant accelerated quickly and "screamed" to Bailey "What'd you say?" and Bailey responded, "You need to hang up and drive." The Defendant, who Bailey described as "ranting," said, "We'll meet again," and Bailey said he called the Defendant a "crazy son-of-a-bitch." The Defendant yelled, "[W]atch this" and proceeded to swerve toward Bailey's truck four or five times. Finally, the Defendant swerved toward Bailey and hit the passenger-side mirror and the front end of Bailey's truck. Bailey said his son had to "jerk" his arm inside the vehicle to keep it from getting hit. Bailey testified that the Defendant hit his truck twice, once when he hit the side mirror and one time when he hit the right side of the frame.

Bailey said that, after the Defendant hit his truck, he brought his truck to a stop, and the Defendant stopped his truck also. Bailey called 911 on his cellular phone, and, as he was speaking to the 911 operator, the Defendant came "flying around" to his side of the truck. Bailey said he was afraid the Defendant had a gun. The Defendant then went back to his truck, staying near the back of the Defendant's truck.

Bailey testified that the two trucks were blocking both lanes of traffic, so Bailey told the 911 operator that he was going to move his truck forward and onto the shoulder of the highway. Bailey pulled in front of the Defendant's truck and into the right lane to allow traffic to pass them. The Defendant then jumped back into his truck, accelerated, and hit Bailey's truck from behind. Bailey said he had his foot placed on the brake and that the Defendant hit his truck with such force that he pushed Bailey's truck ten feet, turning Bailey's truck sideways through a red light before the truck came to a stop.

2

Bailey said that, at this point, he was "begging" the 911 operator for help. He attempted to give the operator the Defendant's license tag number, but he could not read it because the plate was bent. The Defendant started to leave, and Bailey followed him, again asking the 911 operator to send an officer. Bailey followed the Defendant, who traveled at a high rate of speed and then made a u-turn. The Defendant kept waving at Bailey, seeming to indicate for Bailey to follow him. Ultimately, a police officer also began to follow the Defendant, who eventually pulled into a business owned by the Defendant's father. Several other police officers pulled into the business parking lot. The Defendant "jumped" out of his truck and went inside the business. Officers followed him and brought him back outside.

The Defendant pushed his way through the officers and came "ranting" toward Bailey. The Defendant ran toward Bailey and tried to punch him. Bailey said he ducked, and the Defendant hit Bailey's son, knocking him to the ground. Bailey said his son's eye was "busted," and he identified a picture taken shortly after the Defendant hit his son. Officers then jumped on the Defendant.

Bailey identified pictures of his truck which showed damage to the truck's bumper area. He said that he had to have his truck repaired and that the repair cost approximately $1800.

On cross-examination, Bailey conceded that the Defendant had already pled guilty to assaulting his son. Bailey agreed that the Defendant had not spoken to him before he yelled at the Defendant to get off his phone and drive. After the Defendant asked him what he had said, Bailey again told him to hang up and drive. Bailey agreed that he did not use a "friendly" tone. Bailey said he did not call the Defendant a "crazy son-of-a-bitch" until the Defendant started swerving at him.

Cody Allen Bailey, Ricky Bailey's son, testified that he was seventeen-years-old at the time of this incident. He said that, before this incident, he never had any problems with the Defendant. That day, he and his father were headed to pick up a camper in Knoxville to see if the camper would fit on his father's truck. While they were driving, they saw the Defendant apply the brakes and drift into their lane. Cody said that he and his father started laughing because the Defendant was all by himself and seemed to apply his brakes for no reason. The Defendant then swerved into their lane and almost hit them. As they drove by him, Cody's father told the Defendant to hang up and drive. Cody described his father's voice as "ordinary" when he spoke to the Defendant and said that he did not seem mad and did not scream.

Cody recalled that, at that point, the Defendant swerved toward their truck three or four times and that the Defendant made contact with their truck on two occasions. Cody said

3

he was "scared" because he had his arm outside the passenger-side window on the side where the Defendant hit their truck. Cody recounted how, after the Defendant hit their truck, his father stopped their truck. The Defendant also stopped, so the two trucks were blocking both lanes of traffic. Cody said his father called 911 and then pulled in front of the Defendant's car to allow traffic to pass.

Cody confirmed that the Defendant got out of his truck and went to the back of the truck where he stayed near the license plate for "[n]ot long at all." Cody said that, after this, the Defendant rammed the rear end of their truck once or twice, pushing them into an intersection. The Defendant then went around their truck and appeared to be leaving the scene, so Cody's father, who was still speaking with the 911 operator, followed the Defendant. Cody said he could not read the Defendant's license plate number because the Defendant's tag was bent.

Cody confirmed that he and his father followed the Defendant until they ultimately ended up at a trucking business where the Defendant parked his truck. Cody recalled that the police officers were there and that the Defendant came running toward his father. Cody stated that the Defendant punched him in the face because his father ducked. The police intervened and restrained the Defendant.

On cross-examination, Cody testified that the Defendant had pled guilty for assaulting him. Cody confirmed that the first time that his father told the Defendant to hang up and drive, he spoke in a normal voice. The Defendant then sped up and said "what did you say," and his father told the Defendant to hang up and drive a second time. The second time his father spoke, he was "[n]ot as friendly" because the Defendant had "sped up" and was "mouthing off [by saying] what did you say."

William Owens, an officer with the LaFollette Police Department, testified that he was off duty on August 15, 2008. He said that he was at an Exxon station purchasing a drink when he heard a crash and tires "squealing." He looked toward the sound and saw one truck strike the back end of another truck. The truck in the back looked to be accelerating and pushing the other truck. Officer Owens said that, although he was off duty, he had his portable radio on and heard a dispatch call about the crash. The police officer said he got into his personal vehicle and followed the two trucks, allowing a marked police car that had its emergency blue lights activated to pass him enroute. Officer Owens estimated that the Defendant traveled approximately one and a half miles before stopping, all while being followed by a police cruiser that had its emergency lights activated. Officer Owens said that, after the Defendant stopped, there was a "scuffle" that he did not see but that he heard take place. As a result of the scuffle, he saw injury to Cody's eye. Officer Owens described the Defendant's behavior as "aggressive." The police officer also noted that the Defendant's

4

license plate had been "bent" upward so that it was unreadable.

On cross-examination, Officer Owens testified that he did not know what happened between the two vehicles before he saw the one truck strike the other truck. The officer said the Defendant turned himself in to police three days after this incident.

Dennis Chadwell, an officer with the Campbell County Sheriff's Department, testified that he was working as a LaFollette Police Department Officer at the time of this incident. He received a call dispatching him to the scene of the accident and, while en route to the scene, dispatch informed him that the trucks were moving away from the scene. Officer Chadwell turned across the median, caught up with the trucks, and pulled behind Bailey's truck. The dispatcher informed Officer Chadwell that he had pulled behind the complainant, so Officer Chadwell drove around Bailey's truck and pulled in behind the Defendant.

Officer Chadwell said he noted the Defendant's license plate had been turned upward, so, without stopping the Defendant, he could not get the identification of the registered owner or the vehicle information. The Defendant continued driving his truck for approximately half a mile before he pulled into "Bert Hatmaker Trucking." Officer Chadwell approached the Defendant, whom he described as "upset," and scolded him for not stopping when the officer initiated the traffic stop. The Defendant began to explain the incident that occurred between Bailey and him. The Defendant told the police officer that Bailey had told him to "hang up and drive," and then the two exchanged words. The Defendant said Bailey then got in front of his truck, so the Defendant used his truck to push Bailey's truck into the intersection so he could drive around him. The Defendant insinuated that he was scared of Bailey at the time of the incident.

Officer Chadwell described the Defendant as "irate" at the time he was speaking with him. The police officer identified the videotape taken by his patrol car after his blue lights were activated. In the video, the Defendant told the police officer that he bent his license plate upwards to prevent Bailey from reading the plate. He explained that he was concerned that Bailey had bad intentions.

On cross-examination, the police officer testified that he had never had a problem with the Defendant, either before or after this incident.

Hansford Hatmaker, the Defendant's uncle, testified that he was in a separate car following the Defendant on August 15, 2008. He was driving and had a passenger, Jason Sheets, in his car. Hatmaker testified that the Defendant was in front of him and, as they were driving, he saw the Defendant's truck move from the fast lane to the slow lane. It appeared that the Defendant's truck and a second truck almost collided. Near a stoplight, the

second truck pulled in front of the Defendant and "at the same time, they touched each other's bumper[s]." Hatmaker said that the Defendant got out of his truck, righted a gas can that had fallen over in the bed of his truck, and got back into his truck to leave. Hatmaker saw Bailey follow the Defendant as the two left the scene.

On cross-examination, Hatmaker testified that he held a position on the city counsel, which was responsible for hiring and firing LaFollette Police Department officers. Hatmaker said he never heard squealing tires and never saw Bailey on the phone. Hatmaker agreed that he found it unusual that the two trucks collided and no one called police. Hatmaker agreed that it had been two years since this incident and that he saw no reason he should have previously told prosecutors what he had seen that day.

Based upon this evidence, the jury found the Defendant not guilty of one count of reckless endangerment and told the trial court it was unable to reach a verdict on the two counts of assault. The jury convicted the Defendant of one count of reckless endangerment, one count of assault, and one count of leaving the scene of an accident. The trial court sentenced the Defendant to concurrent sentences of two years for the reckless endangerment conviction, eleven months and twenty-nine days for the assault conviction, and thirty days for the leaving the scene of an accident conviction. The court ordered the Defendant to serve sixty days in jail, with the balance of his sentence to be served on probation. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction for reckless endangerment because it is unclear against whom the reckless endangerment occurred and also because the evidence did not prove that he used his vehicle as a weapon. The State counters that the Defendant was properly convicted of the reckless endangerment of the "public at large" and that the evidence sufficiently supported this conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence.

*Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Our statute defines reckless endangerment as occurring when a person, acting recklessly, "engages in conduct that places or may place another person in imminent danger

7

of death or serious bodily injury." T.C.A. § 39-13-103(a) (2010). Reckless endangerment committed with a deadly weapon is a Class E felony. T.C.A. § 39-13-103(b) (2010). To demonstrate an imminent danger of death or serious bodily injury, the State must prove that a person or a class of persons was "placed in a reasonable probability of danger as opposed to a mere possibility of danger." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999).

In *Payne*, the Tennessee Supreme Court adopted the following definition of "imminent" from Black's Law Dictionary:

> Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous. Something which is threatening to happen at once, something close at hand, something to happen upon the instant, close although not yet touching, and on the point of happening.

7 S.W.3d at 28 (quoting BLACK'S LAW DICTIONARY 750 (6th ed. 1990)). The Court explained that in order "for the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." *Payne*, 7 S.W.3d at 28. The Court further explained that the "zone of danger" is "that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." *Id.* The Court reasoned that the State had the duty to "show that a person or class of persons were in an area in which a reasonable probability of danger existed." *Id.* When permitted by the facts, the State may prosecute a defendant for criminal acts committed either against individual victims or against the public at large. *State v. Cross*, 362 S.W.3d 512, 520-21 (Tenn. 2012). An automobile can constitute a "deadly weapon" within the meaning of the definition of "deadly weapon" set forth in Tennessee Code Annotated section 39-11-106(a)(5)(B) (2010). *See State v. Tate*, 912 S.W.2d 785, 787 (Tenn. Crim. App. 1995).

In this case, the Defendant was convicted of one count of reckless endangerment. The Defendant is correct that the indictment does not specifically list the alleged victim. It appears from the record, however, that this count related to the "public at large," a class of people that includes both Ricky and Cody Bailey. We conclude that the evidence sufficiently supports the Defendant's conviction. The Defendant rammed Bailey's truck while the two were driving in adjacent lanes. Bailey stopped after the collision and called 911. The Defendant stopped in the adjacent lane, so Bailey pulled in front of the Defendant in order to allow some traffic to pass. The Defendant then drove his truck into the back of Bailey's truck twice. Bailey had his foot on the brake, and the Defendant hit him with enough force

to push Bailey's truck approximately ten feet, through a red light and into an intersection. We conclude that a rational jury could have concluded that the Defendant's actions by pushing Bailey's truck into an intersection placed Bailey, his son, and others in the area in imminent danger of death or serious bodily injury, so as to satisfy the elements of reckless endangerment. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE